UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

DELANA SAPOZHNIKOV, individually and
as the parent and natural guardian of D.G.,
a minor, and S.G., a minor,                                    18 Civ. 1652 (ENV) (RER)

                Plaintiffs,                              **SECOND AMENDED
COMPLAINT AND
JURY DEMAND**

        -against-

THE CITY OF NEW YORK, MATTHEW
TRIGUERO, POLICE SERGEANT
FARRELL GOLDMAN, POLICE OFFICER
CHANTHOU PANG, POLICE OFFICER
MOHAMMAD ALI, and POLICE OFFICER
HAMMAD SYED,

                Defendants.
----------------------------------------------------------x

     Plaintiffs Delana Sapozhnikov, D.G., and S.G., by and through their attorneys, Cuti

Hecker Wang LLP, for their Second Amended Complaint allege as follows:

### NATURE OF THE CASE

     1.     This case is about three domestic violence victims, Plaintiff Delana Sapozhnikov

and her two minor children, D.G. and S.G., who were subjected to months of severe abuse by

Defendant Matthew Triguero, and who were singled out for disfavored treatment by corrupt

officers of the New York Police Department's 61st Precinct.

     2.     As detailed below, the Defendant police officers knew that there was an order of

protection in place forbidding Triguero from having any contact with Plaintiffs.  They knew that

Triguero was violating the order of protection by terrorizing Plaintiffs on an almost daily basis.

They knew that they had ample probable cause and, indeed, an affirmative statutory duty to

arrest him.  And yet they did nothing for months – all because a sergeant from the 61st Precinct had a personal relationship with and sought to protect Triguero.

## JURISDICTION AND VENUE

3.      This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York common law.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

5.      Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## THE PARTIES

6.      Plaintiff Delana Sapozhnikov resides in Brooklyn, New York.  She is the mother of minor Plaintiffs D.G. and S.G.

7.      Plaintiff D.G. is nine years old and resides in Brooklyn, New York with Ms. Sapozhnikov.

8.      Plaintiff S.G. is eight years old and resides in Brooklyn, New York with Ms. Sapozhnikov.

9.      Defendant City of New York (the "City") is a municipality organized and existing under the laws of the State of New York.  At all times relevant to this complaint, the City, acting through the New York City Police Department (the "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters, and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel.  In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and the State of New York.  At all relevant times, Defendants Police Sergeant Farrell Goldman, Police Officer Pang, Police Officer

2

Ali, and Police Officer Syed (collectively, the "Police Defendants") were employed by the City and acting within the scope of their employment by the City.

10.     At all times relevant to this complaint, Defendant Matthew Triguero resided in Brooklyn, New York.

11.     At all times relevant to this complaint, Defendant Police Sergeant Farrell Goldman ("Sergeant Goldman") was a police sergeant and member of the NYPD.  With regard to all relevant events, Sergeant Goldman was acting within the scope of his capacity as agent, servant, and employee of the City.  Upon information and belief, Sergeant Goldman was at all relevant times assigned to the 61st Precinct in Brooklyn.  At all relevant times, Sergeant Goldman was acting under color of state law.

12.     At all times relevant to this complaint, Defendant Police Officer Chanthou Pang ("Officer Pang") was a police officer and member of the NYPD.  With regard to all relevant events, Officer Pang was acting within the scope of her capacity as agent, servant, and employee of the City.  Upon information and belief, Officer Pang was at all relevant times assigned to the 61st Precinct in Brooklyn.  At all relevant times, Officer Pang was acting under color of state law.

13.     At all times relevant to this complaint, Defendant Police Officer Mohammad Ali ("Officer Ali") was a police officer and member of the NYPD.  With regard to all relevant events, Officer Ali was acting within the scope of his capacity as agent, servant, and employee of the City.  Upon information and belief, Officer Ali was at all relevant times assigned to the 61st Precinct in Brooklyn.  At all relevant times, Officer Ali was acting under color of state law.

14.     At all times relevant to this complaint, Defendant Police Officer Hammad Syed ("Officer Syed") was a police officer and member of the NYPD.  With regard to all relevant events, Officer Syed was acting within the scope of his capacity as agent, servant, and employee

of the City.  Upon information and belief, Officer Syed was at all relevant times assigned to the 61st Precinct in Brooklyn.  At all relevant times, Officer Syed was acting under color of state law.

**JURY DEMAND**

15.     Plaintiffs hereby demand a trial by jury.

**FACTUAL ALLEGATIONS**

**Ms. Sapozhnikov Meets Defendant Triguero**

16.     Ms. Sapozhnikov is a single mother who works hard to provide for her two sons, D.G. and S.G, who are nine and eight years old, respectively.

17.     In the summer of 2016, Ms. Sapozhnikov met Defendant Matthew Triguero ("Triguero") via an online dating website.

18.     Ms. Sapozhnikov and Triguero became romantically involved.

19.     Not long after they began dating, Ms. Sapozhnikov, D.G., and S.G. moved into an apartment located at 4099 Bedford Avenue in Brooklyn, which was and remains a two-family home (with an apparently illegal basement apartment) owned by Triguero's parents, Susan and Roy Triguero.

20.     Triguero's parents lived in the first floor apartment.

21.     Ms. Sapozhnikov, D.G., and S.G. moved into the second floor apartment.

22.     Not long after Ms. Sapozhnikov moved into the second floor apartment, Triguero revealed to her that he previously had been arrested for domestic violence.  Triguero told Ms. Sapozhnikov that his former girlfriend had accused him of physically assaulting her.

23.     Triguero informed Ms. Sapozhnikov that he had gotten this criminal charge dismissed with the assistance of Sergeant Goldman, with whom he had attended Madison High School.

24.     Triguero informed Ms. Sapozhnikov that he had called Sergeant Goldman and asked Sergeant Goldman to help him beat the domestic violence charges against him.

25.     Triguero informed Ms. Sapozhnikov that after he called Sergeant Goldman and asked for help, Triguero's parents gave money to Sergeant Goldman in exchange for his assistance.

26.     Triguero told Ms. Sapozhnikov that soon after his parents paid money to Sergeant Goldman, the charges against him were dropped.

27.     Although Triguero did not identify Sergeant Goldman to Ms. Sapozhnikov by name, Triguero showed Ms. Sapozhnikov a photo of Sergeant Goldman, boasting that Sergeant Goldman was the officer who had helped him beat the charges.

**Triguero Turns Violent**

28.     The early days of Ms. Sapozhnikov's relationship with Triguero were emotionally intense.

29.     Triguero often vacillated between extreme affection and emotionally abusive behavior, included frequent yelling and demeaning remarks to Ms. Sapozhnikov.

30.     Triguero's emotional abuse evolved into physical abuse when, about a month into the relationship, Triguero approached Ms. Sapozhnikov during a heated verbal argument and slapped her across the face.

31.     Triguero's physical abuse of Ms. Sapozhnikov then became more common.

32.     Triguero frequently body checked Ms. Sapozhnikov against the wall as he walked past her, used the refrigerator door as a weapon by repeatedly slamming it against her body, and violently pushed her out of bed onto the floor during the night.

33.     In or about Fall 2016, Ms. Sapozhnikov cut the top of her index finger off while cooking.

34. Her finger was reattached and stitched together at a local emergency room.

35. A few days later, while her wound was still fragile, Triguero attacked Ms. Sapozhnikov as she was getting into her car to go pick up her children from school.

36. Triguero slammed the car door on Ms. Sapozhnikov's body multiple times, pulled her by her hair, and threw her onto the ground.

37. Ms. Sapozhnikov's finger was split open again during the attack, and she had to have it re-attached at the hospital.

38. Triguero's physical and emotional abuse of Ms. Sapozhnikov continued for several months thereafter.

39. Ms. Sapozhnikov had tattooed Triguero's name on her arm. By January 2017, however, in direct response to Triguero's physical and emotional abuse, Ms. Sapozhnikov had caused her tattoo of Triguero's name to be covered with another tattoo.

40. In or about early January 2017, Triguero first noticed that Ms. Sapozhnikov had tattooed over Triguero's name, and he flew into a violent rage.

41. Triguero screamed at Ms. Sapozhnikov and spat in her face, and he violently threw objects in the house.

42. D.G. and S.G. were at home during this episode.

43. Ms. Sapozhnikov was extremely concerned about the well being of her children – both because they were witnessing Triguero's extremely frightening behavior, and because she feared that he might physically harm them.

44. Ms. Sapozhnikov therefore took the children and ran with them from the house.

45. Triguero caught up with them as they ran down the street.

46. Ms. Sapozhnikov returned to the house with the children, hoping that Triguero's parents would assist her.

47.     Ms. Sapozhnikov ushered D.G. and S.G. into the first floor apartment occupied by Triguero's parents.

48.     Triguero caught up to Ms. Sapozhnikov before she could enter the first floor apartment and slammed the door into her multiple times.

49.     Triguero then grabbed Ms. Sapozhnikov and pulled her down the stairs of the front stoop, causing serious injury to Ms. Sapozhnikov's ankle.

50.     Ms. Sapozhnikov hobbled into the first floor apartment to check on her children.

51.     As she crossed the threshold, Susan, Triguero's mother, slammed Ms. Sapozhnikov against the wall and attempted to choke her.  Ms. Sapozhnikov, D.G., and S.G. ran to PS 206, her children's school, in search of safety.  From there, Ms. Sapozhnikov called 911.

52.     Members of the 61st Precinct responded to the call.

53.     PS 206 was placed on temporary lockdown status because the school feared that Triguero posed a threat to school safety.

**Triguero Is Arrested, and an Order of Protection is Entered Against Him**

54.     The responding officers from the 61st Precinct escorted Ms. Sapozhnikov back to her apartment.

55.     Ms. Sapozhnikov could hardly walk because of her ankle injury.

56.     The police arrested Triguero at the scene.

57.     Triguero was processed, arraigned, and released the next day.

58.     An order of protection (the "Order of Protection") was entered against Triguero.

59.     The Order of Protection prohibited Triguero from associating with, speaking to, or having any contact with Ms. Sapozhnikov, D.G., or S.G.

60.     The Order of Protection also specified that Triguero was not to come anywhere near PS 206.

61.     For a period of months thereafter, D.G. and S.G. were released from PS 206 directly to Ms. Sapozhnikov through the school's main office – a departure from normal protocol designed to ensure the children's safety.

**The Conspiracy to Frustrate the Order of Protection**

62.     The day after the incident, Ms. Sapozhnikov returned home to the second floor apartment at 4099 Bedford Avenue to find that knives had been placed in plain view all throughout the apartment.

63.     Neither Ms. Sapozhnikov nor her children had placed the knives in such positions.

64.     Ms. Sapozhnikov became frightened and felt threatened.  She therefore called the police.

65.     Officer Pang and another officer responded.

66.     Ms. Sapozhnikov submitted a police report regarding the threatening placement of knives all over her apartment.

67.     Officer Pang and the other officer left.

68.     Later that same day, after Triguero was released from jail, Triguero returned to 4099 Bedford Avenue and began screaming at and otherwise harassing Ms. Sapozhnikov.

69.     For a second time that day and third time in two days, Ms. Sapozhnikov called 911 regarding Triguero's unlawful behavior.

70.     Officers Ali and Syed responded to this 911 call.

71.     Triguero abruptly left the house as soon as he saw and/or heard the police cars approach, but he soon returned, parking his vehicle down the street.  From that perch, Triguero stared menacingly at Ms. Sapozhnikov while she spoke to the police in front of the house.

72.     At one point, the officers entered the first floor apartment to speak with Triguero's parents.  Triguero immediately drove his car to the front of the house, yelled at Ms. Sapozhnikov, and spat in her face.

73.     Triguero left before the officers emerged from the first floor apartment.

74.     Ms. Sapozhnikov told the officers about what Triguero had just done, and the officers called for backup.

75.     Officer Pang and another officer responded.

76.     Sergeant Goldman also responded at some point thereafter.

77.     Ms. Sapozhnikov immediately recognized Sergeant Goldman as the sergeant whose photo Triguero had shown her and who Triguero had told her helped get the previous domestic violence charges dismissed.

78.     Sergeant Goldman literally laughed at Ms. Sapozhnikov.

79.     Sergeant Goldman told Ms. Sapozhnikov falsely that the Order of Protection allowed Triguero to be at 4099 Bedford Avenue.

80.     Sergeant Goldman went so far as to admonish Ms. Sapozhnikov for allegedly "abusing the system" by calling 911.

81.     Sergeant Goldman and his subordinates, including Officers Pang, Ali, and Syed, refused to arrest Triguero or even permit Ms. Sapozhnikov to file a police report.

82.     Upon information and belief, Sergeant Goldman declined to arrest Triguero, even though he knew Triguero had violated the Order of Protection, because of Sergeant Goldman's personal friendship with Triguero, and because Triguero's parents had in the past paid him to protect Triguero.

83.     Upon information and belief, the other Police Defendants declined to arrest Triguero, even though they knew Triguero had violated the Order of Protection, because they

were made aware of Sergeant Goldman's personal friendship with Triguero and instructed not to arrest Triguero on that basis.

**The Harassment Continues Unabated**

84.     For the next several months, Triguero continued to violate the Order of Protection and severely harass Ms. Sapozhnikov and her children on an almost daily basis with no consequences.

85.     Triguero was at the house virtually every day in blatant violation of the Order of Protection.

86.     Triguero severely harassed Ms. Sapozhnikov and her children virtually every day in blatant violation of the Order of Protection.

87.     Triguero regularly screamed obscenities at Ms. Sapozhnikov and her children and called them names.

88.     Triguero regularly threatened to kill Ms. Sapozhnikov, including in the presence of D.G. and S.G.

89.     Triguero regularly threatened to kill D.G. and S.G., including in their presence.

90.     Triguero regularly spat in Ms. Sapozhnikov's face.

91.     Triguero regularly blasted loud music from the first floor apartment late at night, when he knew the children and Ms. Sapozhnikov would be asleep upstairs.

92.     Triguero regularly used his key to unlock and lock the door to the second floor apartment, over and over again, with the obvious intention of reminding Ms. Sapozhnikov and her children that he had access to her home.

93.     Ms. Sapozhnikov and her children lived in unrelenting terror.  For months, she slept on the floor of her children's room with a butcher knife nearby in case she needed to protect her sons from an attack by Triguero.

94.     During this period (the first half of 2017), Ms. Sapozhnikov called 911 many times, typically during the daytime hours, desperately hoping that the New York City Police Department would enforce the Order of Protection.  But they never did.

95.     Ms. Sapozhnikov always called 911 out of earshot of Triguero because she did not want him to be alerted to the fact that the police were on the way to the house.

96.     Nearly every time Ms. Sapozhnikov called 911, Triguero suddenly left the premises immediately before the police arrived.

97.     Upon information and belief, Sergeant Goldman and/or those he directed regularly warned Triguero, by calling or texting his mobile phone, that Ms. Sapozhnikov had called 911 and that the police were on the way to the house.

98.     Most often, the responding officers were Officer Ali, Officer Syed, and/or Officer Pang.

99.     Every time Officer Ali, Officer Syed, or Officer Pang responded to a 911 call placed by Ms. Sapozhnikov, they failed to take any meaningful steps to investigate Ms. Sapozhnikov's repeated complaints that Triguero was blatantly violating the Order of Protection, including by cruelly terrorizing her children.

100.    Every time Officer Ali, Officer Syed, or Officer Pang responded to a 911 call placed by Ms. Sapozhnikov, they minimized Ms. Sapozhnikov's complaints and stated falsely that Triguero was allowed to be at 4099 Bedford Avenue because his disabled mother lived there.

101.    In truth, although the Order of Protection contained a carve-out permitting Triguero to come to 4099 Bedford Avenue occasionally provided that he stayed away from and did not harass Ms. Sapozhnikov or the children, Triguero regularly and intentionally violated the

Order of Protection by threatening and otherwise severely harassing Ms. Sapozhnikov and the children.

102.     Officer Pang went so far as to accuse Ms. Sapozhnikov of lying about Triguero's harassment, telling her falsely on one occasion that Triguero supposedly was out of town when he had in fact left the premises only minutes before Officer Pang arrived.

103.     On approximately two occasions, officers other than the Police Defendants responded to Ms. Sapozhnikov's 911 complaints.

104.     These other officers treated Ms. Sapozhnikov and her children markedly differently from the way Police Defendants did.

105.     These other officers responded promptly to Ms. Sapozhnikov's 911 calls and investigated her complaints thoroughly.

106.     Notably, Triguero did not flee the scene before the police arrived on the approximately two occasions in which officers other than the Police Defendants responded to Ms. Sapozhnikov's 911 complaints.

107.     On these approximately two occasions, Triguero hid in his parents' apartment while the police investigated Ms. Sapozhnikov's complaints.  He was able to sneak out of the basement while the officers searched elsewhere in the house for him.

108.     Although the officers were not able to arrest Triguero on these approximately two occasions, they exhibited eagerness to help Ms. Sapozhnikov address Triguero's obviously unlawful behavior.

**Ms. Sapozhnikov Relocates Herself and Her Children**

109.     In or about June 2017, Ms. Sapozhnikov decided to move with her children to her friend's apartment at 2935 Ocean Parkway in Brooklyn.

110.     On or about June 15, 2017, Ms. Sapozhnikov and her friend packed up Ms. Sapozhnikov's and the children's belongings and called two cars from a local car service to transport them and their things from Bedford Avenue to Ocean Parkway.

111.     While Ms. Sapozhnikov was in the second floor apartment, she saw out the window that Triguero gave money to one of the two car service drivers that she had hired.  She also overheard the driver give Triguero the address of her destination.

112.     As Ms. Sapozhnikov, her children, and her friend left in one of the cars, Triguero began to follow them in his car.  She instructed the driver to maneuver so that Triguero could not keep up, but he increased speed and began chasing them.

113.     Ms. Sapozhnikov was so afraid that she called 911 from the car twice, but no officers from the 61st Precinct responded despite the dispatcher having informed her that officers were on their way to her location.

114.     Ultimately, Ms. Sapozhnikov's car let Triguero pass and, once they did not see him anymore, her car continued to the new address.

115.     The next day, Triguero appeared at her new home at 2935 Ocean Parkway, which is located in the 60th Precinct.

116.     Ms. Sapozhnikov called 911, and members of the 60th Precinct responded promptly.

117.     Ms. Sapozhnikov told the officers about her experience during the previous six months, including Triguero's behavior, his persistent and flagrant violations of the Order of Protection, and the 61st Precinct's habitual refusal to arrest him or otherwise enforce the Order of Protection.

118.     The responding officers from the 60th Precinct were sympathetic and took a report from Ms. Sapozhnikov regarding Triguero's harassment of her and her children.

119.    One of the officers told Ms. Sapozhnikov that he thought there was something suspicious about the other precinct's handling of her repeated complaints about Triguero's repeated violations of the Order of Protection.

120.    The officer gave Ms. Sapozhnikov the telephone number for an internal affairs officer to explore the 61st Precinct's responses to her previous complaints about Triguero.

**Triguero Is Arrested Again**

121.    In or about July 2017, Ms. Sapozhnikov's friend obtained and turned over to the police video footage of Triguero outside her new residence the day after she moved there.  A few weeks later, Ms. Sapozhnikov was informed that Triguero had been arrested on charges relating to his harassment of Ms. Sapozhnikov.

122.    Upon information and belief, Triguero eventually pled guilty to some or all of these charges.

123.    Triguero has not bothered Ms. Sapozhnikov or her children since his second arrest.

124.    But Ms. Sapozhnikov and her children suffered immensely, and needlessly, during the approximately six months in which the Police Defendants failed to enforce the Order of Protection.

125.    Plaintiffs have filed a Verified Petition for Leave to Serve a Late Notice of Claim in New York Supreme Court, Kings County (Index No. 505298/2018).

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – 14th Amendment – Equal Protection Clause
(Against the Police Defendants)

126.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

127.     The Police Defendants deprived Plaintiffs of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, by, *inter alia*: failing to respond promptly and properly to Ms. Sapozhnikov's reports of Triguero's violations of Plaintiffs' Order of Protection; warning Triguero that the police had been dispatched to Plaintiffs' residence so that Triguero could avoid arrest; and failing to arrest Triguero despite ample probable cause; and perpetuating Plaintiffs' fear for their own safety.

128.     Upon information and belief, other similarly situated women and children who had obtained duly served orders of protection against the perpetrators of domestic violence and who sought help from the 61st Precinct when their orders of protection were violated received such help from the NYPD.

129.     Upon information and belief, in such other circumstances, similarly situated perpetrators were not given advance warning about the NYPD's imminent arrival and were arrested in accordance with N.Y. C.P.L. § 140.10(4).

130.     Plaintiffs' circumstances did not differ from those of similarly situated individuals to a degree that would justify the differential treatment they received on the basis of a legitimate government policy.

131.     The similarity in circumstances and difference in treatment between Plaintiffs and the other similarly situated individuals who received proper police attention when they reported violations of duly served orders of protection are sufficient to exclude the possibility that the Defendants acted on the basis of a mistake.

132.     Sergeant Goldman knew that he was treating Plaintiffs differently from other similarly situated individuals and intentionally singled Plaintiffs out for unfavorable treatment because of his personal relationship with Triguero.

133.     There was no legitimate law enforcement basis for Sergeant Goldman's intentional disparate treatment of Plaintiffs.

134.     There was no legitimate public or governmental interest of any kind that motivated or justified Sergeant Goldman's intentional disparate treatment of Plaintiffs.

135.     Sergeant Goldman's intentional disparate treatment of Plaintiffs was irrational and wholly arbitrary.

136.     Upon information and belief, Sergeant Goldman refused to arrest Triguero, and instructed the other Police Defendants not to arrest Triguero, because of their personal friendship, and because Triguero's parents had in the past paid Sergeant Goldman to protect Triguero.

137.     Upon information and belief, Sergeant Goldman instructed the Police Defendants to ignore Plaintiffs' Order of Protection and otherwise permit Triguero to avoid arrest.

138.     Sergeant Goldman acted for personal reasons, with discriminatory intent and effect.

139.     Officer Pang, Officer Ali, and Officer Syed acted under the direction and control of Sergeant Goldman.

140.     The Police Defendants were aware that there was no legitimate purpose in singling out Plaintiffs for differential treatment.

141.     The Police Defendants were aware that there was no legitimate purpose in failing to enforce the Order of Protection.

142.    The Police Defendants were aware that they had ample probable cause to arrest Triguero, that he had been systematically harassing Plaintiffs, and that there was no legitimate purpose in failing to arrest him.

143.    Upon information and belief, Officer Pang, Officer Ali, and Officer Syed were instructed by Sergeant Goldman to ignore their obligations to enforce Plaintiffs' Order of Protection, and they knew that Sergeant Goldman was motivated by his personal relationship with Triguero and the desire to profit financially.

144.    In taking the actions complained of in the foregoing paragraphs, the Police Defendants acted under pretense and color of state law, in their individual and official capacities, and within the scope of their employment as NYPD officers.

145.    The Police Defendants' actions were without authority of law and were an abuse of their power, and they acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their rights under the Fourteenth Amendment to the United States Constitution (as made actionable by 42 U.S.C. § 1983).

146.    Sergeant Goldman affirmatively placed his personal relationship with Triguero above his obligations as a police officer in reckless disregard for the risks to Plaintiffs' safety.

147.    Sergeant Goldman acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard for Plaintiffs' rights, privileges, welfare, and wellbeing, and is guilty of egregious and gross misconduct towards Plaintiffs.

148.    As a direct and proximate result of the misconduct detailed above, Plaintiffs sustained the damages alleged in this Complaint.

**SECOND CAUSE OF ACTION**
Common Law Intentional Infliction of Emotional Distress
(Against Defendant Triguero)

17

149.   Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

150.   Triguero engaged in extreme and outrageous conduct that was intended to cause or was in disregard of a substantial probability of causing Plaintiffs to suffer severe emotional distress, and did in fact cause Plaintiff to suffer severe emotional distress.

151.   Such conduct included, without limitation, menacingly toying with Ms. Sapozhnikov's front door lock to demonstrate that he retained a key to her apartment and was willing to use it; yelling into Ms. Sapozhnikov's apartment that "I'm going to fucking kill you and the kids" while Ms. Sapozhnikov and her sons were inside; and spitting in Ms. Sapozhnikov's face on no fewer than four occasions.

152.   Triguero's conduct transcended recognized bounds of decency and is atrocious and intolerable in a civilized society.

153.   Triguero's conduct directly and proximately caused Plaintiffs to experience severe emotional distress.

154.   As a direct and proximate result of the misconduct detailed above, Plaintiffs sustained damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
Common Law Assault and Battery
(Against Defendant Triguero)

155.   Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

156.   Triguero intentionally, willfully and maliciously assaulted Plaintiffs, in that he had the real or apparent ability to cause imminent harmful and/or offensive bodily contact to Plaintiffs, and intentionally did violent and/or menacing acts which threatened such contact to Plaintiffs, and that such acts caused apprehension of such contact in Plaintiffs.

157.    Such acts include, without limitation, banging violently on the front door and yelling into Plaintiffs' home, "I'm going to fucking kill you and the kids," while he was in known possession of a key to the apartment and when he was aware that Plaintiffs were just inside the apartment.

158.    Triguero intentionally made offensive and unwanted bodily contact with Ms. Sapozhnikov.

159.    Such conduct included, without limitation, spitting directly and aggressively into Ms. Sapozhnikov's face from close proximity to her such that saliva landed on Ms. Sapozhnikov.

160.    Such contact happened no fewer than four times.

161.    As a direct and proximate result of the misconduct detailed above, Plaintiffs sustained damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
Negligence
(Against the City and the Police Defendants)

162.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

163.    Under N.Y. C.P.L. § 140.10(4)(b), the Police Defendants were required to arrest Defendant Triguero upon learning that he had violated a duly served order of protection.

164.    As victims of domestic violence and having been threatened with violence, Plaintiffs are members of the class of persons for whom C.P.L. § 140.10 was enacted to protect. Implying a private right of action for violations of C.P.L. § 140.10 would promote the legislative purpose of the statute and would be consistent with the legislative scheme.

165.    The City and the Police Defendants owed an affirmative duty of care to Plaintiffs in that they had a special relationship with Plaintiffs arising out of, *inter alia*: (1) the existence

of a duly served Order of Protection entered by a judge after having reviewed allegations of

violence and/or improper treatment by Triguero against Plaintiffs, which triggered certain

specific, mandatory duties on the part of the NYPD; (2) prior knowledge by the Police

Defendants of Triguero's history of violence and of the existence of Plaintiffs' Order of

Protection against him; (3) the Police Defendants' responses to Ms. Sapozhnikov's repeated 911

calls complaining of Triguero's violations of Plaintiffs' Order of Protection; and (4) Plaintiffs'

reasonable expectation of protection against Triguero.

166.   Plaintiffs justifiably relied on numerous communications Ms. Sapozhnikov had

with members of the NYPD in expecting that the NYPD would protect Plaintiffs from Triguero

pursuant to the terms of Plaintiffs' Order of Protection.

167.   D.G. and S.G. are minors who are deemed to have relied on the Police Defendants

to discharge their legal duty to arrest Triguero.

168.   Defendants breached the duty of care owed to Plaintiffs by, *inter alia*, warning

Triguero that officers had been dispatched to Ms. Sapozhnikov's resident; and failing to respond

properly to Ms. Sapozhnikov's repeated complaints that Triguero was violating Plaintiffs' Order

of Protection.

169.   These breaches permitted Triguero to avoid arrest and continue his unlawful

behavior.

170.   All of the foregoing occurred without any fault on the part of Plaintiffs.

171.   The Police Defendants took the actions complained of in the aforementioned

paragraphs within the scope of their employment and in furtherance of carrying out their

functions as members of the NYPD.  Defendant City, as the Police Defendants' employer, is

responsible for their wrongdoing under the doctrine of *respondeat superior.*

172.    As a direct and proximate result of the misconduct detailed above, Plaintiffs

sustained damages in an amount to be determined at trial.

**<u>FIFTH CAUSE OF ACTION</u>**
Negligent Hiring and Retention of Employment Services
(Against the City)

173.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set

forth herein.

174.    Upon information and belief, Defendant City, through the NYPD, owed a duty of

care to Plaintiffs to prevent the mental and emotional abuse Plaintiffs suffered at the hands of the

Police Defendants.

175.    Upon information and belief, Defendant City, through the NYPD, owed this duty

of care to Plaintiffs because under the same or similar circumstances, a reasonable, prudent, and

careful person would have anticipated that his conduct was likely to result in an injury to

Plaintiffs or similarly situated individuals.

176.    Upon information and belief, the Police Defendants were unfit and incompetent

for their positions.

177.    Upon information and belief, Defendant City knew or should have known through

the exercise of reasonable diligence that the Police Defendants were potentially dangerous.

178.    Upon information and belief, Defendant City's negligence in hiring and retaining

the Police Defendants proximately caused Plaintiffs' injuries.

179.    Upon information and belief, Plaintiffs incurred significant, severe, and lasting

emotional harm because of the City's negligent hiring and retention of the Police Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

a.      Awarding compensatory damages for all emotional distress, anxiety, humiliation, injury to reputation, emotional harm, pain and suffering, career, family and social disruption and other grievous harm, in an amount to be determined at trial;

b.      Awarding punitive damages in an amount to be determined at trial; and

c.      Awarding pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as this Court may deem just and proper.

Dated: April 17, 2018
     New York, New York                        CUTI HECKER WANG LLP


                                        By:_____ /s/ _____
                                            Eric Hecker
                                            John R. Cuti
                                          Alice G. Reiter

                                        305 Broadway, Suite 607
                                        New York, New York 10007
                                        (212) 620-2602
                                        ehecker@chwllp.com
                                        jcuti@chwllp.com
                                        areiter@chwllp.com

                                        *Attorneys for Plaintiffs*